

U.S. Department of Justice

United States Attorney
Eastern District of New York

WMP
F. #2013R01251

271 Cadman Plaza East
Brooklyn, New York 11201

September 3, 2015

**By ECF**

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Howard Leventhal
Criminal Docket No. 13-695 (BMC)

Dear Judge Cogan:

The government writes in response to the defendant's letter, dated August 25, 2015 ("Def. Ltr."), requesting that the Court's scheduling order be modified and for leave to retain the services of a medical expert. For the reasons set forth below, the government respectfully submits that the defendant's request is meritless and should be denied. Additionally, the government respectfully moves the Court, pursuant to 18 U.S.C. § 3148, to issue a warrant for the arrest of the defendant for violating conditions of his release.

I. Background

A. The Charged Conduct

The defendant was the President, Chief Executive Officer and Chief Technology Officer of mHealth Technologies Corp. ("mHealth Technologies"), formerly named Neovision USA, Inc. ("Neovision"). The defendant incorporated Neovision in Illinois on March 6, 2009 and changed its name to mHealth Technologies on May 1, 2013. The defendant was also the President of Heltheo, Inc. ("Heltheo").

In or around March 2012, the defendant was introduced to Paragon, a "factoring" company with its principal place of business in Fort Lauderdale, Florida, by an independent broker. In or about April 2012, the defendant flew to Florida and met with representatives of Paragon with the goal of entering into a factoring agreement with Paragon. At this meeting, the defendant falsely represented to Paragon that Neovision had entered into an agreement with Health Canada, whereby Neovision would provide Health Canada with "Heltheo's McCoy Home Health Tablet," a medical device named after the fictional Dr. Leonard McCoy of TV's Star Trek series.

Under the terms of the factoring agreement, Paragon would advance Neovision $800,000 in exchange for $2 to $4 million purportedly owed to Neovision by Health Canada. To induce Paragon to enter into this factoring agreement, on or about March 22, 2012, the defendant sent to Paragon, by facsimile, a document entitled "Articles of Agreement," which purported to be an agreement between Neovision and "Her Majesty the Queen in right of Canada . . . represented by the Minister of Health" (the "HC Agreement"). The HC Agreement, dated March 16, 2012, was signed by the defendant as President of Neovision and purportedly signed by Glenda Yeates, Canada's then-Deputy Minister of Health.

On or about May 9, 2012, based on the defendant's representations, Paragon entered into a factoring agreement with Neovision. On or about May 24, 2012, Paragon executed four separate bank wire transfers to Neovision totaling $800,000. In September 2012, when Paragon attempted to collect the money owed to Neovision by Health Canada, an individual claiming to be "Shea McConagle, Staff Attorney, Chief Financial Officer Branch (CFOB), Health Canada" informed Paragon that the HC Agreement was suspended and would remain so until Neovision found a replacement lender. As of December 20, 2013, Paragon had neither received a payment from Health Canada nor received a refund of the $800,000 advance payment made to Neovision.

Contrary to the defendant's representations to Paragon: (a) the HC Agreement was a fraudulent document; (b) Health Canada had not entered into any agreements with Neovision and did not owe Neovision or any of the defendant's companies any money; (c) Deputy Health Minister Glenda Yeates's purported signature on the HC Agreement was a forgery; and (d) Shea McConagle was not employed by Health Canada.

Additionally, in or about and between December 2011 and November 2013, the defendant used versions of the same fraudulent HC Agreement and made numerous other false representations in an attempt to obtain money from a number of other individuals and companies, including TD Bank in Toronto, Canada and a law enforcement official acting in an undercover capacity (the "UC"). Over the course of these attempts, the defendant made false representations about, inter alia, (a) contracts his company had with Health Canada and other entities, (b) revenue generated through the sale of Heltheo's McCoy Home Health Tablet, and (c) investments by notable individuals in his company.

In furtherance of his scheme, the defendant also created and distributed fabricated Bank of America statements for Neovision that displayed millions of dollars in transactions and payments from Health Canada to Neovision. For example, the fraudulent Bank of America statements for Neovision sent by the defendant to the UC showed a beginning balance of $1,684,614.92 on March 1, 2013, an ending balance of $870,034.24 on July 31, 2013, and more than $21 million in combined deposits and withdrawals during that period. In fact, Neovision's bank statements for the same account and time period received directly from Bank of America showed a beginning balance of $1,789.31 on March 1, 2013, an ending balance of $4,326.36 on July 31, 2013, and approximately $300,000 in combined deposits and withdrawals during that

period. Additionally, Neovision's true bank statements for the same account and time period revealed that there were no deposits or wire transfers from Health Canada.

Finally, to effectively execute his scheme to defraud, the defendant fraudulently used the identities of representatives of Health Canada, including Deputy Minister of Health Glenda Yeates. Specifically, the defendant forged Deputy Minister Glenda Yeates's signature on the fraudulent HC Agreement. The defendant also created telephone and facsimile numbers and an email account in the name of "Glenda Yeates."

B.  Procedural History

On October 22, 2013, the defendant was arrested pursuant to a complaint alleging wire fraud. (Docket entry no. 1). Following removal proceedings, on October 30, 2013, the defendant made his initial appearance in the Eastern District of New York and was released on a $200,000 unsecured bond signed by the defendant and Malgorzata Kubiak, as a suretor. (Docket entry nos. 6 and 7). The conditions of release required that the defendant remain within the Northern District of Illinois, except for travel to and from New York for court appearances and meetings with defense counsel. The conditions additionally permitted travel within the United States for business "with prior notices to [the] gov't and pre-trial." (Id.) (emphasis added).

On December 23, 2013, approximately two months after his arrest, the defendant waived indictment and pleaded guilty to a two-count information charging him with wire fraud, in violation of 18 U.S.C. § 1343, and aggravated identity theft, in violation of 18 U.S.C. § 1028A. Following the plea allocution, the Court scheduled sentencing for April 3, 2014.

By the end of February 2014, the defendant and then-defense counsel had reached irreconcilable differences (docket entry nos. 16-23), and the defendant took drastic steps in his dispute with defense counsel, including filing a $25 million lawsuit against defense counsel in the Northern District of Illinois (see 14-cv-2173), and issuing a "press release" on a website announcing the filing of such lawsuit. On March 5, 2014, the Court granted then-defense counsel's motion to withdraw as counsel and appointed CJA attorney Steve Zissou, Esq. as defense counsel. On May 9, 2014, while represented by current defense counsel, the defendant reconfirmed his December 23, 2013 guilty plea, following which the Court set sentencing for September 12, 2014.

Following three adjournment requests by defense counsel, the Court rescheduled sentencing for January 6, 2015. On December 30, 2014, the defendant, for the first time and a year after he pleaded guilty to a charge that included a mandatory minimum sentence, made an application for leave to retain a Bureau of Prisons ("BOP") expert "to make a threshold determination of the capability of the BOP to provide him with adequate care" for his medical issues. (Docket entry no. 43). By letter dated January 5, 2015, the government opposed the defendant's request for a BOP expert. (Docket entry no. 44). Following the January 6, 2015 status conference, the government submitted a letter from the BOP regarding its capabilities to treat the defendant's medical conditions (docket entry no. 47), the defendant filed a letter and

declaration from its BOP expert Philip Wise (docket entry no. 48), and the government replied to the declaration by Mr. Wise (docket entry no. 49). Following yet another status conference, the government retained a gastroenterologist to conduct a medical examination of the defendant and prepare a report of the gastroenterologist's findings. The gastroenterologist conducted a medical examination of the defendant and submitted a report, which was filed with the Court on August 4, 2015 (docket entry no. 57).

At the August 6, 2015 status conference, after reviewing the gastroenterologist's report, the Court determined that there were no constitutional issues at stake and scheduled sentencing for October 19, 2015, while providing defense counsel with an opportunity to submit a response to the gastroenterologist's medical report. On August 27, 2015, the defendant filed the instant letter requesting a further delay and modification of the scheduled sentencing, and leave to retain the services of a medical expert.

II.     The Defendant's August 25, 2015 Letter

Under the medical/health issues section, defense counsel cites to paragraph 69 of the Pre-Sentence Investigation Report ("PSR") issued by the Probation Department on March 13, 2014. With respect to the negative side effects referenced in this paragraph in the PSR, it is now apparent that the basis for this information was a letter by Dr. Charles S. Colodny (the "Colodny Letter"), which was addressed to the Probation Officer and submitted as an attachment to the defendant's August 25th letter. After detailing the alleged negative side effects of the defendant's medical condition, defense counsel argues the following: (i) the defendant's health issues "raise a serious concern as to whether the BOP is capable of adequately treating him if he is incarcerated for a significant period of time"; (ii) "the government's submissions to the Court raise genuine concerns about whether or not the government truly understands the depth and gravity of the health care issues confronting the Court and the Bureau of Prisons"; and (iii) "[a]t best, the [government's] submissions evince a striking level of indifference to what is certainly a life and death issue." (Def. Ltr. 2).

Defense counsel then proceeds to attack the gastroenterologist's report, referring to the information in the report as, inter alia, (i) "difficult to reconcile"; and (ii) "woefully inadequate, but dangerous." (Def. Ltr. 3). In a remarkable statement, defense counsel then states that the gastroenterologist "makes some unusual observations that suggest he might not have reviewed all of the records that were provided to the probation department." (Def. Ltr. 4). Specifically, defense counsel attacks the gastroenterologist's report where it stated – "it is curious why [the defendant] did not seek medical care sooner" – and then exclusively relies on the Colodny Letter for almost two pages to describe the defendant's numerous medical issues. (Def. Ltr. 4-5).

As an initial matter, it is incongruous that defense counsel argues that the gastroenterologist should have reviewed the letter sent to the probation department by Dr. Colodny. Prior to the government retaining the gastroenterologist to perform the medical examination on the defendant, the government specifically asked defense counsel for "all the

medical reports submitted to Probation and [the defendant's] BOP expert." The Colodny Letter was not provided to the government by defense counsel and not seen by the government until it was attached to the defendant's August 25, 2015 letter, and hence, not provided to the examining gastroenterologist.

Regardless, and somewhat shockingly – even for this defendant – the government has determined that the Colodny Letter, on which defense counsel almost exclusively relies on for his attack on the government and the gastroenterologist, is a sham and complete fabrication. The FBI interviewed Dr. Colodny by telephone earlier today and he confirmed that although the defendant is one of his patients, he has never written any letter on behalf of the defendant, let alone a letter to the U.S. Probation Department. Dr. Colodny added that any such letter written by him would be on his clinic letterhead and bear his signature. The Colodny Letter was not on any letterhead and did not contain any signature. Finally, upon reviewing the Colodny Letter submitted in the defendant's August 25, 2015 letter, Dr. Colodny confirmed that he did not write the letter.

Put simply, the defendant's fraud on the Probation Department and the Court, while he is awaiting sentencing, is appalling and inexcusable. The delay and costs incurred by the defendant as a result of this fraud will not be recouped but it is time to put an end to the defendant's fraud. The Court should deny the defendant's request for any rescheduling and issue a warrant for the arrest of the defendant for this extraordinary violation and the violations described below.

III.   The New Fraudulent Conduct

   A.   The Go2Nurse Scheme

Undeterred by a federal felony conviction in the instant case, the defendant assumed a new alias – "Edward Ben-Alec" – to perpetrate a new fraud scheme. As Edward Ben-Alec, the defendant claimed to be the Technology Business Strategist of Go2Nurse ("G2N"), a subsidiary of MyWings Foundation, Inc. ("MyWings"), a purported non-profit organization. Malgorzata "Meg" Kubiak, the suretor on the defendant's bond, is listed as the President of MyWings.

According to G2N's website, Ben-Alec has "decades of experience developing hardware devices as a designer for RadioShack" and "teaches smartphone app development and holds a U.S. patent in computer cryptography." G2N markets itself on its website (http://go2nurse.com) and through its private placement memorandum as "The Uber of Home Nursing." G2N further represents that it has developed an original proprietary smartphone and tablet software application connecting nurses and patients. G2N purports to provide access through its application to licensed registered nurses, licensed professional nurses, certified nursing assistants, nurse practitioners, and other professional medical service providers.

In or about January and February 2015, the defendant and Ms. Kubiak, through MyWings, requested letters of support from a United States Representative and a United States Senator in connection with MyWings. The defendant was involved in these requests for MyWings, but used the alias Edward Ben-Alec and communicated via the email account ed@mywings.tv. Records received from various sources have confirmed that the defendant is the subscriber and user of email account ed@mywings.tv, which is affiliated with MyWings and G2N. Based on representations by the defendant and Ms. Kubiak, MyWings received letters of support from the United States Representative and United States Senator. The letters of support were intended by the authoring organizations to serve the limited purposes of aiding a non-profit organization in securing specific government grants. However, the defendant and MyWings did not seek or receive any Department of Education funding, and instead fraudulently altered the letters for use in soliciting private investments.

The defendant used the fraudulently-altered letters from the United States Representative and the United States Senator to induce a nearly 80-year old investor in Boca Raton Florida (the "Florida Investor") to invest in MyWings. Indeed, the defendant traveled from Illinois to Florida on more than one occasion to meet with the Florida Investor and convince him to invest in MyWings.[1] Notably, the Florida Investor was unaware that the defendant had been arrested and had pled guilty for engaging in a fraudulent scheme where he stole a person's identity. Based on the defendant's material misrepresentations and omissions, in or about late August 2014, the Florida Investor invested $25,000 in MyWings. The defendant subsequently signed a promissory note providing that the Florida Investor would receive $100,000 for his investment.

Prior to the defendant receiving the Florida Investor's $25,000, the MyWings bank account had a balance of $12.36. After the $25,000 deposit was received on September 5, 2014, there were numerous ATM withdrawals and purchases through debit card(s) for, inter alia, the following items/companies: gas, restaurants, movie tickets, Starbucks, Wal-Mart, Target, Home Depot, Bath & Body Works, Craigslist, Amazon, PayPal, and Radio Shack. By February 19, 2015, the Florida Investor's $25,000 had been essentially spent and there was a balance of $538.46. The defendant and Ms. Kubiak were the authorized signatories on this account. A couple months later, in or about April 2015, the defendant induced the Florida Investor to invest an additional $10,000 in MyWings.

Additionally, on or about May 16, 2014, the defendant had induced the Florida Investor to invest $20,000 in U.S. Legal Guru, Inc. ("US Legal Guru"), a reported Android mobile application producer. Bank records, among other things, confirm that the defendant was the President and authorized signatory on the US Legal Guru bank account that received the

---

[1] Although the defendant notified the Pre-Trial Services of some, if not all, of his business trips, he never notified the government of his trips to Florida and other destinations outside of the Northern District of Illinois and New York, a violation of the conditions of his release on bond.

Florida Investor's $20,000.  On or about May 20, 2014, the defendant wrote a check to Ms. Kubiak for $1,000, and on or about May 23, 2014, the defendant made a personal counter withdrawal of $18,310.15.  At the close of business on May 23, 2014, the US Legal Guru bank account balance was $0.

The government has additional evidence of the defendant's fraud through Go2Nurse and his use of the alias "Edward Ben-Alec" in furtherance of the scheme.  Specifically, the government possesses evidence of the defendant's attempts to defraud a health management company in Illinois and a venture capital investment firm in Kansas.[2]

Finally, it bears noting that the defendant was able to make numerous trips across the country to perpetrate fraud despite his alleged "life and death" medical conditions that make him unfit for confinement with the BOP.

    B.    <u>The NDIL Bankruptcy Case</u>

The defendant's <u>modus operandi</u>, as was evident in his dealings with prior defense counsel and some of the victims of the charged scheme in this case, was to threaten his victims and adversaries with litigation.  This is perhaps best evident in the bankruptcy case that was recently decided in the Northern District of Illinois.  <u>See</u> <u>In re Michael H. Meltzer</u>, No. 13 B 31151 (N.D. Ill.).  Attached are two decisions by Judge A. Benjamin Goldgar that find that the defendant filed petitions in bad faith.  The defendant has appealed the decisions.

In the memorandum opinion, filed August 25, 2015 (attached as Exhibit A), Judge Goldgar awards punitive damages against the defendant and Kubiak, and details how the defendant and Kubiak "deliberately filed an involuntary petition against Meltzer to torment him and prevent him from exercising his rights in the state court."  (<u>See</u> p. 22).  Indeed, Judge Goldgar added that "the petition involved the fabrication of claims, the impersonation of others, the forging of signatures, even the creation of a new corporation to ensure there would be enough creditors."  (<u>Id.</u>).

In the memorandum opinion, filed July 29, 2015 (attached as Exhibit B), Judge Goldgar sanctioned the defendant for violating bankruptcy Rule 9011 by making a frivolous filing in the bankruptcy court while he was awaiting sanctions on the above-referenced involuntary chapter 7 case.  This opinion contains references to the instant criminal case brought about by the defendant's May 15, 2015 filing of a Freedom of Information Act ("FOIA") request on Judge Goldgar and attaching a transcript of a January 2015 hearing before Your Honor.  (<u>See</u> pp. 3-4).

---

[2] Again, although the defendant notified the Pre-Trial Services of some, if not all, of his trips to Kansas, he never notified the government of these trips, a violation of the conditions of his release on bond.

These opinions are instructive because they involve conduct by the defendant while he was released on bond.

IV.  The Motion for Bond Revocation

   A.  Legal Standard

The applicable legal standard for revocation of a defendant's pretrial release is set forth in Title 18, United States Code, Section 3148, which provides, in relevant part, as follows:

(b)  Revocation of release. – The attorney for the Government may initiate a proceeding for revocation of an order of release by filing a motion with the district court.... The judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer —

   (1)  finds that there is—

      (A)  probable cause to believe that the person has committed a Federal, State, or local crime while on release; or

      (B)  clear and convincing evidence that the person has violated any other condition of release; and

   (2)  finds that—

      (A)  based on the factors set forth in section 3142(g) of this title, there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or

      (B)  the person is unlikely to abide by any condition or combination of conditions of release.

   B.  Application

Based on the foregoing, the government respectfully submits that there is probable cause to believe that the defendant has committed a federal crime, and clear and convincing evidence to show that the defendant violated conditions of his release.

The defendant's numerous fraudulent actions, which include submitting a fabricated medical report to the Court and the Probation Department and his fraud on the Florida Investor, demonstrate that there are no conditions or combination of conditions of release that will assure that the defendant will not pose a danger to the safety of the community and makes evident that the defendant is unlikely to abide by any condition or combination of conditions of

release. 18 U.S.C. § 3148(b)(2). The current suretor's involvement in some of the defendant's fraudulent conduct make it clear that she does not provide any moral suasion as a surety on the bond.

Accordingly, the government requests that an arrest warrant be issued for the defendant Howard Leventhal so that he may be brought before the Court, at which time the government will move for revocation of release, pursuant to 18 U.S.C. § 3148(b), and, in the alternative, for revocation of the release order, pursuant to 18 U.S.C. § 3145(a)(1). Attached as Exhibit C is a proposed warrant.

V. Conclusion

For the reasons set forth above, the government respectfully requests that the Court deny the defendant's request for any modification of the scheduling order and that an arrest warrant be issued for the defendant Howard Leventhal so that he may be brought before the Court for violating conditions of his release.

Respectfully submitted,

KELLY T. CURRIE
Acting United States Attorney
Eastern District of New York

By: /s/
Winston M. Paes
Assistant U.S. Attorney
(718) 254-6023

Enclosures

Cc: Clerk of the Court (BMC) (By ECF)
Steve Zissou, Esq. (By ECF and Email)